David OVERTON and Jerome I. Kransdorf, Plaintiffs–Appellants,

v.

TODMAN & CO., CPAS, P.C. and Trien, Rosenberg, Rosenberg, Weinberg, Ciullo & Fazzari, Defendants–Appellees.

Docket No. 06–2496–cv.

United States Court of Appeals, Second Circuit.

Argued: Dec. 7, 2006.

Decided: Feb. 26, 2007.

Eric S. Hutner, Hutner Klarish LLP, New York, NY, for Plaintiffs–Appellants.

Jordan Sklar, Babchick & Young LLP (Jack Babchik, on the brief), White Plains, NY, for Defendants–Appellees.

Before KEARSE, McLAUGHLIN, and STRAUB, Circuit Judges.

STRAUB, Circuit Judge.

This case requires us to examine one circumstance in which an accountant may incur primary liability for securities fraud. Plaintiffs-appellants David Overton and Jerome I. Kransdorf filed this action against Todman & Co., CPAs ("Todman"), and its successor in interest, Trien, Rosenberg, Rosenberg, Weinberg, Ciullo & Fazzari, LLP, asserting a fraud claim under § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5, and related state law claims. In a brief memorandum order, the District Court for the Southern District of New York dismissed the federal claim with prejudice for failure to plead a viable theory of primary liability and, as a result, dismissed the state law claims for lack of subject matter jurisdiction.

The precise issue on appeal is whether an auditor may incur primary liability under § 10(b) and Rule 10b–5 when the auditor provides a certified opinion that is false or misleading when issued, subsequently learns or was reckless in not learning that the earlier statement was false or misleading, knows or should know that potential investors are relying on the opinion, yet

fails to take reasonable steps to correct or withdraw its opinion and/or the underlying financial statements. We hold that under such circumstances, an auditor becomes primarily liable for securities fraud, assuming all the other elements of a securities fraud claim are present. Since the complaint pleads precisely this theory of liability, we vacate the District Court's dismissal and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Todman's Flawed Audits and Subsequent Failure to Correct Its Certified Opinion

For the purposes of a motion to dismiss, we take the following facts from the complaint and presume their truth. From 1999 through 2002, Todman audited the financial statements of Direct Brokerage, Inc. ("DBI"), a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a member firm of the New York Stock Exchange ("NYSE"). Each year, Todman issued its "unqualified" opinion that DBI's financial statements accurately portrayed the company's fiscal health.

Specifically, in its certification of DBI's 2002 financial statement, Todman set forth that, "In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Direct Brokerage Inc. as of December 31, 2002, and the results of its operations and its cash flows for the year then ended in conformity with U.S. generally accepted auditing principles." As required by law, DBI filed its yearly financial statements, along with Todman's certified opinions, with the SEC and NYSE.

Despite its certifications of accuracy, Todman made significant errors that concealed DBI's largest liability. In 1998, payroll taxes were DBI's largest single line item; its certified financial statements for that year reflect a payroll tax liability of $248,899. Yet in 1999, DBI's statements inaccurately reflected a payroll tax liability of zero. Todman's work papers show no explanation for the wholesale and erroneous disappearance of that line item. In its 2000 audit, Todman perpetuated its error by again inaccurately recording DBI's payroll tax liability. Moreover, Todman failed to uncover these errors in either its 2001 or 2002 audits.

Plaintiffs allege several facts in support of their assertion that Todman recklessly audited DBI's affairs and recklessly evaluated whether DBI could "survive as an ongoing concern." As a general matter, plaintiffs point out that because payroll taxes were DBI's largest line item, the "nature and size of the financial misstatements relative to DBI's size demonstrates a complete reckless disregard in accurately stating the true financial position of DBI."

More particularly, plaintiffs allege that Todman ignored five red flags that cast serious doubt on the accuracy of DBI's financial statements. First, in 1998 a Todman auditor noted "a large payroll tax payable at the end of the year" and noted "that such an amount necessitated further analysis to determine if the liability was understated," but no analysis was ever done. Second, Todman knew that DBI paid no payroll tax after June of 1998 even "though plainly people were working and payroll taxes were due," but did not investigate this apparent anomaly. Third, Todman knew that DBI's payroll taxes dropped from $248,899 to zero between 1998 and 1999, but never investigated this large discrepancy. Fourth, Todman knew that DBI employee compensation rose significantly in 1999 while DBI's payroll tax liabilities fell precipitously, but did not investigate the divergence. Fifth, Todman

knew that this diverging trend continued in 2000, but again failed to investigate.

The errors in DBI's financial statements ultimately came to light in early 2003. In February, the New York State Division of Taxation subpoenaed DBI's payroll records. When DBI thereafter appeared before the Division of Taxation, it was determined that the company had not filed or paid its payroll taxes for 1999 or 2000. DBI later began its own internal investigation that revealed that its former CFO failed to record the payroll tax liabilities on the company's books.

In addition to its internal investigation, DBI retained the forensic accounting firm Integrated Management Solutions to evaluate Todman's audits. Over several months, a representative of Integrated reviewed Todman's work and interviewed several Todman employees. The Integrated representative "concluded that [Todman's] audits were deficient and lacking in many respects," specifically, that if Todman had properly reviewed DBI's payroll tax liabilities, "it would have been apparent that [Todman] should have delved deeper into the materials that were available to them or should have made further inquiry of DBI employees in a manner sufficient to learn that there were serious problems with the handling of payroll issues."

These events left DBI in precarious financial position by June of 2003. Its unrecorded liabilities amounted to more than $3 million in unpaid taxes, interest, and penalties. In addition to the tax-related liabilities, DBI needed approximately $950,000 in immediate capital to meet the SEC's and NYSE's capitalization requirements. The company also required further infusions of capital going forward.

Based on the above facts, plaintiffs allege that "Todman became aware of each of the events relating to the discovery of DBI's undisclosed liability ... and DBI's concomitant need for additional capital, at or about the time each event occurred." Todman also knew of "DBI's ... efforts to secure new capital," and that DBI's "financial statements would be provided to ... potential investors." Yet "Todman never took any steps to withdraw its certification or clean opinion," and never issued "any kind of directive or instruction to DBI not to disclose the financial statements."

In 2003, DBI's officers and directors infused roughly $950,000 into the company. In order to satisfy the remaining obligations, however, they turned to outside investors. Plaintiff-appellant Overton was among those solicited to invest in DBI. In connection with the investment solicitation, Overton received DBI's audited and certified 2002 financial statements. Overton "relied principally on the audited financial statements certified by Todman and issued under cover of Todman's 'clean' opinion," and took Todman's opinion "to represent a seal of approval regarding [DBI's] financial affairs."

Overton agreed to invest a substantial sum. In January of 2004, he entered into a Stock Purchase Agreement and Subordinated Loan Agreement with DBI, by which "Overton invested $500,000 into DBI and loaned $1,500,000 to DBI." Three months later, DBI collapsed under the weight of its liabilities, defaulted the loan, and ceased operations when the NYSE summarily suspended it.

## II. The District Court's Decision

Plaintiffs filed suit in the Southern District of New York, alleging six claims. The only claim relevant here, Count I, alleges that by failing to correct its 2002 certified opinion under the circumstances described above, Todman made a materially misleading misrepresentation and omission under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, and

thereby damaged Overton. In connection with this claim, Overton did not plead or rely on Todman's alleged recklessness in initially conducting its audit; Todman's initial recklessness was alleged only in connection with the state law claims. Defendants moved to dismiss Count I pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

After hearing oral argument, the District Court granted the motion and dismissed the claim with prejudice. The reason that Overton's securities fraud claim failed, according to the District Court, was that Todman's failure to correct its certified opinion simply was not "actionable under the federal securities laws." The District Court conceded that in *Wright v. Ernst & Young LLP*, 152 F.3d 169, 177 (2d Cir.1998), we set forth that "[a]ccounting firms do have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying." Nevertheless, for three reasons the District Court concluded that this passage did not adequately support plaintiffs' theory of liability.

First, the District Court characterized that passage as dicta. Second, the District Court concluded that the passage was no longer good law. In so concluding, the District Court noted that *Wright* took the above quotation from a section of *IIT v. Cornfeld*, 619 F.2d 909, 927 (2d Cir.1980), in which we analyzed a claim of accountant aiding and abetting liability. The District Court then noted that after we decided *Cornfeld*, the Supreme Court held in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that § 10(b) does not authorize aiding and abetting liability. From this sequence, the District Court reasoned that pursuant to *Cornfeld*, an accountant's failure to correct its certi-

fied opinion may support only aiding and abetting liability, pursuant to *Central Bank* there can be no such liability, and therefore, an accountant's failure to correct its certified opinion does not trigger liability at all. The District Court did not discuss the fact that we decided *Wright* after, and in light of, *Central Bank.* Third, the District Court noted that "DBI was a closely-held corporation whose stock was not traded on a public exchange," and, we assume, concluded that the securities laws applied with less-than-normal rigor, or not at all.

After dismissing Count I on the sole ground that plaintiffs failed to plead a viable theory of primary liability, the District Court did not address whether the complaint adequately pled any other elements of a Rule 10b–5 claim.

## DISCUSSION

### I. Standard of Review

We review *de novo* a district court's Rule 12(b)(6) dismissal. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 167 (2d Cir. 2005). As noted above, we accept as true all factual allegations contained in the complaint and draw all reasonable inferences in the plaintiff's favor. *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir.2004). Ultimately, "[w]e uphold [such] a dismissal only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotation marks omitted).

### II. The Duty to Correct

A fundamental principle of securities law is that before an individual becomes liable for his silence, he must have an underlying duty to speak. *Chiarella v. United States*, 445 U.S. 222, 227–28, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). In a line of cases

beginning with *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980), we have alluded to one such duty to speak: an accountant's duty, in certain circumstances, to correct its certified opinion. Despite our prior statements on the subject, we have not until today squarely held that such a duty exists, and that its violation gives rise to primary liability under the securities laws.

In *Cornfeld,* we considered whether an auditor could be liable as an aider and abettor for failing to disclose the existence of a raiding conspiracy between a mutual fund and a complex of companies. The auditor had issued certified financial statements for the fund. Unsurprisingly, those statements did not divulge the existence of the conspiracy. Plaintiffs sued on the theory that the auditor, having certified the financial statements, was under a duty to disclose such information as it became known, and that the violation of that duty rendered the accountant liable as an aider and abettor to securities fraud.

We recognized that "[a]ccountants do have a duty to take reasonable steps to correct misstatements they have discovered in previous [certified] financial statements on which they know the public is relying." *Id.* at 927. However, we limited this duty to only those statements that the accountant actually prepared and certified. *Id.* Since the information that the plaintiffs claimed the accountant should have disclosed—the conspiracy—was not a *correction* of anything *in the certified statements,* the auditor had no duty to disclose it, and the claim was dismissed. *Id.* Because the plaintiff had charged the accountant as an aider and abettor only, we had no opportunity or reason to consider whether primary liability could arise from a violation of the duty to correct, and did not reach that issue. *Id.* at 921 (noting that the complaint pleaded only an aiding and abetting violation against the auditor).

Fourteen years later, in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that § 10(b) does not authorize aiding and abetting liability. In order to be liable under § 10(b), the Court held, an actor must *himself* "mak[e] ... a material misstatement (or omission) or ... commi[t] ... a manipulative act." *Id.* at 177, 114 S.Ct. 1439. The rationale underpinning this holding was that (1) by its terms, § 10(b) requires the making of a statement or omission and (2) without such a statement or omission, the "critical" element of reliance would be absent. *Id.* at 180, 114 S.Ct. 1439.

Although the Court did not specifically discuss an auditor's duty to correct, it made clear that under its newly-announced rule, secondary actors such as accountants may incur primary liability based on their omissions:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

*Id.* at 191, 114 S.Ct. 1439.

Shortly thereafter, in *Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997), we again addressed an accountant's duty to correct a certified statement, this time within the context of a claim of primary liability. We also, for the first time, offered insight into the source of this duty. *Shapiro* concerned a suit by a group of investors over a complex of sham limited partnerships.

The investors claimed that the partnerships' accountant was primarily liable for securities fraud because it had provided financial projections circulated in the partnerships' offering memoranda without disclosing that one of the principals was a convicted felon and his 12–year–old son was the sole officer, director, and shareholder of a managing entity.

We held that the complaint failed to state a claim predicated on the accountant's omissions. We reasoned that a duty to disclose arises only "when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Id.* at 721 (quoting *Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108) (alterations incorporated). We recognized that when an accountant issues a certified opinion, it creates the required special relationship with the investing public:

> The concept of a duty to disclose appears to stem from the extent of reliance on the accountant's work made by the public and the expectations of the public. Clearly, in a situation in which the accountant "gives an opinion or certifies statements" about a company—statements which the accountant later discovers may not have been accurate ...— then the accountant has a duty to disclose the fraud to the public .... Conversely, if an accountant does not issue a public opinion about a company, although it may have conducted internal audits or reviews for portions of the company, the accountant cannot subsequently be held responsible for the company's public statements issued later merely because the accountant may know those statements are likely untrue.

*Id.* (quoting *In re Cascade Int'l Sec. Litig.,* 894 F.Supp. 437, 443 (S.D.Fla.1995)); *see also Gold v. DCL Inc.,* 399 F.Supp. 1123, 1127 (S.D.N.Y.1973) (reasoning that an accountant who issues a certified opinion "holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable," which creates "a special relationship of trust [with] the public"); 5C ARNOLD S. JACOBS, DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS § 12:116 (2006) (noting that "accountants assume a special relationship with the public when they audit financial statements").

Apart from issuing a certified opinion, we noted one other way in which an accountant creates a duty to disclose certain facts: "if the accountant exchanges his or her role for a role as an insider who vends the company's securities," then the "accountant shares in an insider's duty to disclose." *Shapiro,* 123 F.3d at 721.

Nevertheless, the complaint at issue in *Shapiro* failed to plead either basis for the duty to disclose; indeed, the complaint alleged only that the accountant "prepar[ed] the financial projections that were later included in the principal defendants' offering memoranda." *Id.* Further, those projections did not contain any misstatement. *Id.* ("[T]here exists no allegation that the projections misrepresented any financial fact."). Because the accountant had neither issued a certified opinion containing a misstatement nor become an insider, it had no duty to speak out. *Id.* at 722. Given the deficiencies in the complaint, we again had no opportunity to hold that the duty to correct a certified opinion exists, and that its violation may give rise to primary liability. Our statements related to the subject, however insightful, were dicta.

The following year, we again addressed in dicta an accountant's duty to correct a certified statement. In *Wright v. Ernst & Young LLP,* 152 F.3d 169 (2d Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999), an investor sued an accountant under § 10(b) on the theory

that the accountant "violated the antifraud provisions of the Act by orally approving [BT Office Product's] materially false and misleading financial statements that BT in turn disseminated to the public in a ... press release." *Id.* at 171. The district court rejected this theory and dismissed the complaint. It concluded that the accountant had not made any statement because the press release expressly provided that the figures were "unaudited" and did not mention the accountant at all. *Id.* at 172. Applying *Central Bank,* the lower court held that in the absence of a misstatement by the accountant, the accountant could not be primarily liable. We affirmed on this ground. *Id.* at 175.

In an effort to save her case, plaintiff pointed to a second document that the accountant itself had issued: its 1995 Report of Independent Auditors, which BT had included in its initial public offering prospectus. *Id.* at 177. On appeal, plaintiff urged—for the first time—that the accountant could be primarily liable because by 1996 it had "discovered facts tending to undermine the accuracy" of its 1995 report, knew that the market was relying on its report, but failed to correct the report. *Id.*

We agreed in principle with this theory of liability, which was a far more focused version of the duty to speak than that urged upon us in *Cornfeld* and *Shapiro.* We reiterated our statement in *Cornfeld* that "[a]ccounting firms 'do have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying.'" *Id.* (quoting *Cornfeld,* 619 F.2d at 927). We further noted that "[s]ilence where there is a duty to disclose can constitute a false or misleading statement within the meaning of § 10(b) and Rule 10b–5." *Id.*

Crucially, however, the plaintiff had failed to plead this theory in the amended complaint and, moreover, had "waived her opportunity to file a second amended complaint." *Id.* at 178 (noting that the complaint "does *not* allege the misrepresentation claim that Wright presses on appeal—namely, that Ernst & Young made a false statement (by omission) in 1996 as a result of its duty and subsequent failure to correct" its 1995 report). We further noted other deficiencies in the amended complaint: it failed to allege that the accountant "knew or was reckless in not knowing" at the time it issued its report that the report "contained false financial information, [or] that the market or those who purchased BT's stock ... relied on the 1995 report." *Id.* Since the amended complaint failed to allege a theory of primary liability predicated on the accountant's failure to correct its 1995 report, we had no basis to reach the issue.

We most recently discussed an accountant's duty to correct its certified opinion in *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147 (2d Cir.2007). We assumed the existence of such a duty but did not decide the issue because, as to one opinion, the duty to correct did not arise within the class period, and as to two other opinions, the plaintiffs failed to adequately allege loss causation. *Id.* at 154 ("assuming" without deciding the existence of a duty to correct and disposing of claims on other grounds).

■ Our discussion thus far illustrates that for many years we have recognized the existence of an accountant's duty to correct its certified opinions, but never squarely held that such a duty exists for the purposes of primary liability under § 10(b) of the 1934 Act and Rule 10b–5. Presented with an opportunity to do so, we now so hold. Specifically, we hold that an accountant violates the "duty to correct" and becomes primarily liable under § 10(b) and Rule 10b–5 when it (1) makes a state-

ment in its certified opinion that is false or misleading when made; (2) subsequently learns or was reckless in not learning that the earlier statement was false or misleading; (3) knows or should know that potential investors are relying on the opinion and financial statements; yet (4) fails to take reasonable steps to correct or withdraw its opinion and/or the financial statements; and (5) all the other requirements for liability are satisfied.[1]

We believe that our holding comports with not only the precedent outlined above, but also other relevant authorities. As an initial matter, the language of § 10(b) and Rule 10b–5 supports the result we reach today. Those provisions extend beyond issuers and traders to prohibit "any person," including accountants and other secondary actors, from engaging in fraud by way of a materially misleading omission. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5.

Further, our decision comports with *Central Bank* in two crucial respects. First, we remain true to the prohibition on aiding and abetting liability because we require that an accountant make its *own* misleading omission by failing to correct its certified opinion. Second, we require, as a component of the underlying duty to correct, what *Central Bank* labeled a "critical" element under § 10(b) and Rule 10b–5: reliance by potential investors on the accountant's omission.

Finally, we note that several secondary authorities agree that an accountant becomes primarily liable under § 10(b) and Rule 10(b)(5) for failing to correct known errors in its certified opinion and/or accompanying financial statements. *See* 2 ALAN R. BROMBERG & LEWIS D. LOWENFELS, BROMBERG AND LOWENFELS ON SECURITIES FRAUD AND COMMODITIES FRAUD § 5:318 (2d ed.2006) (noting that "[t]he duty to the

trading market … to correct one's own prior statements … had been recognized as part of the general 10b–5 obligation to keep the market apprised of material information, or as part of the special responsibility of independent accountants under the securities law"); 5C ARNOLD S. JACOBS, DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS § 12:116 (2006) ("An outside accountant also can be answerable [under Rule 10b–5] for erroneous audited financial statements, even if it exercised proper diligence before opining, if it subsequently discovers and then conceals that the statements were wrong" because "accountants assume a special relationship with the public when they audit financial statements."); ROBERT J. HAFT & MICHELE H. HUDSON, LIABILITY OF ATTORNEYS AND ACCOUNTANTS FOR SECURITIES TRANSACTIONS § 7:9 (2006) ("With respect to existing case law, there appears to be recognition of a duty to correct a statement that is subsequently determined by the maker of the statement to have been false when made.").

■ We pause to note the limits of our holding. Importantly, we hold only that an accountant has a duty to correct its prior certified statements, as opposed to a broader duty to update those statements. The duty to correct requires only that the accountant correct statements that were false *when made*. In contrast, the duty to update requires an accountant to correct a statement made misleading by intervening events, even if the statement was true when made. *See generally In re I.B.M. Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir.1998) (contrasting the duties to correct and update); ROBERT J. HAFT & MICHELE H. HUDSON, LIABILITY OF ATTORNEYS AND ACCOUNTANTS FOR SECURITIES TRANSACTIONS § 7:9 (2006) (noting that an accountant's "duty to update is on a far weaker authori-

---

**1.** The additional components are those typical of all Rule 10b–5 claims, such as materiality,

transaction causation, loss causation, and damages.

tative foundation" than is its duty to correct); *see also id.* at § 3:5 ("The duty to 'correct' is entirely distinct from the duty to 'update.' "). *But cf. In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993) (noting that in limited circumstances, an issuer may have "a duty to update opinions and projections ... if the original opinions or projections have become misleading as the result of intervening events"). On the facts of this case, we need not, and do not, reach the issue of whether an accountant has a duty to update.

■ Further, on the facts now before us, we hold that an accountant need correct only those particular statements set forth in its opinion and/or the certified financial statements. Unless an accountant exchanges its role for the role of an insider, *see Shapiro,* 123 F.3d at 721, an accountant is under no duty to divulge information collateral to the statements of accuracy and financial fact set forth in its opinion and the certified financial statements, respectively. *See Cornfeld,* 619 F.2d at 927.

Moreover, as noted above, we hold only that the duty to correct arises in the circumstances as pled in the securities claim now before us, specifically, when the accountant (1) makes a statement in its certified opinion that is false or misleading when made; (2) subsequently learns or was reckless in not learning that the earlier statement was false or misleading; and (3) knows or should know that potential investors are relying on its opinion. Under those circumstances, if an accountant fails to take reasonable steps to correct or withdraw its certified opinion and/or the underlying financial statements, it becomes primarily liable for a misleading omission under § 10(b) and Rule 10b–5, assuming all the other components of liability are present. We have no occasion to

answer whether the duty to correct might arise in other circumstances.

## III. The District Court Erred in Dismissing the Complaint

■ In light of the above principles, we conclude that the District Court erred in dismissing the complaint. Plaintiffs pled that Todman's certified opinion and DBI's 2002 financial statements were misleading at the time they were issued, especially with respect to DBI's payroll tax liability; Todman, inferably through its contacts with the forensic auditor hired by DBI, subsequently learned that its certified opinion was false; Todman also knew that DBI was soliciting outside investors based in part on its 2002 certified financial statements and Todman's accompanying opinion; and that despite this knowledge, Todman took no action to correct or withdraw its opinion and/or DBI's financial statements. These allegations adequately state a claim of primary accountant liability under § 10(b) and Rule 10b–5.

We further note that DBI's status as a closely-held corporation in no way interdicts the applicability of § 10(b) and Rule 10b–5. *See* 15 U.S.C. § 78(j) ("It shall be unlawful for any person, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange *or any security not so registered,* any manipulative or deceptive device ...." (emphasis added)); *Sulkow v. Crosstown Apparel Inc.,* 807 F.2d 33, 37 (2d Cir.1986) ("The fact that Crosstown was a close corporation ... is insufficient to negate the character of the stock as a security."); *Golden v. Garafalo,* 678 F.2d 1139, 1146–47 (2d Cir.1982) ("[T]he Act has always been understood to apply to transactions in shares of close as well as publicly held corporations ...."); *see also Shapiro,* 123 F.3d at 718–19 (applying § 10(b) to "private placement" transac-

tions effected between individuals and limited partnerships).

Finally, defendants entreat us to examine the sufficiency of the pleadings in other respects, such as the adequacy of the allegations of scienter and loss causation. Because the District Court declined to reach those issues, and because plaintiffs have not yet had the opportunity to amend their complaint, we decline to address those questions now. Instead, "[t]he proper time and place for raising th[ese] point[s] is on remand before the District Court where, if need be, plaintiffs can be afforded an opportunity to replead." *Welch v. Cadre Capital,* 923 F.2d 989, 995 (2d Cir.), *vacated on other grounds by Northwest Savings Bank, PaSa v. Welch,* 501 U.S. 1247, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991); *see also Ross v. A.H. Robins Co.,* 607 F.2d 545, 547, 557–59 (2d Cir.1979).

## CONCLUSION

For the reasons set forth above, we VACATE the District Court's May 2, 2006 dismissal of Overton's securities claim. Further, since the District Court declined to exercise supplemental jurisdiction over the remaining state law claims on the ground that it had dismissed the sole federal claim, and we have vacated that dismissal, we also VACATE the District Court's dismissal of plaintiffs' state law claims. We REMAND for further proceedings consistent with this opinion. No costs are awarded at this time. In the event that Overton ultimately prevails on the merits of his securities claim, the District Court may award plaintiffs the costs of the present appeal.